**UNITED STATES of America, Plaintiff,**

**v.**

**Harold RICH and Sheila Rich, Defendants.**

**No. CIV–S–92–944–DFL–GGH.**

United States District Court,
E.D. California,
Sacramento Division.

April 14, 1994.

John F. Gisla, Asst. U.S. Atty., Sacramento, CA, for plaintiff.

Thomas A. Nickens, Sacramento, CA, for defendants.

### MEMORANDUM OF OPINION AND ORDER

LEVI, District Judge.

The United States seeks a money judgment for the balance owing on a $25,000 loan made by the Farmers Home Administration (FmHA) to defendants for the purchase of farm equipment. Defendants admit that the loan is in default, but assert that the FmHA is barred from suit on the note by the statute of limitations, estoppel, and FmHA's unreasonable conduct. Both parties move for summary judgment.

### I

On September 26, 1980, FmHA loaned $225,000 to the Riches for the purchase of a ranch. In exchange, the Riches executed a promissory note for $225,000, secured by a first deed of trust against the ranch. The Riches defaulted on this note, and FmHA eventually foreclosed against the ranch and sold the property at a substantial loss. FmHA is not pursuing a deficiency judgment against defendants on this loan.

FmHA made a second loan to the Riches in the amount of $25,000 at 11.5% interest on February 27, 1981. This loan was for the purchase of farm equipment. The Riches again executed a promissory note, secured by a lien against the equipment, which was payable in seven annual installments of $5,392 beginning January 1, 1982, and ending January 1, 1988. The Riches made only one payment of $2,500 on the note on January 14, 1982.

On February 14, 1983, one of the Riches visited the FmHA office and reported that they were no longer living at the ranch. At that meeting, the FmHA representative discussed voluntary liquidation of both the ranch and the equipment collateral. This began a series of written and verbal requests from FmHA for authorization to voluntarily liquidate the equipment. FmHA sent written requests to the Riches for authorization on May 6, 1983, and July 18, 1983. FmHA also met with the defendants to discuss voluntary liquidation on August 18, 1983, and had similar telephone conversations on February 6 and February 20, 1985. During the February 20, 1985 conversation, FmHA explained its debt settlement procedures to Sheila Rich and asked her to send her proposal for debt settlement in a letter to FmHA. Defendants failed to follow up on any of these communications or to grant authorization. Finally, on February 11, 1986, FmHA sent defendants a Notice of Intent to Take Adverse Action, again advising them of available debt servicing options. The Riches once more failed to respond and, on May 8, 1986, FmHA advised them that FmHA was proceeding with adverse action. On August 4, 1986, FmHA accelerated both of defendants' promissory notes.

In the meantime, the Riches sought buyers for the ranch and the equipment. The Riches entered into at least four contracts for the sale of the property and the equipment in the period from July 1984 to July 1986. All of these contracts, however, were conditioned on "FmHA having no further recourse against Seller," and when FmHA refused to agree to this term, the first three

contracts fell through. FmHA did approve a July 1986 sales contract with Glenn and Janet Burud and agreed to release defendants' debts.[1] But the Buruds ultimately withdrew their offer in June 1987 when the Cramers, who had tried to buy the ranch in 1985, brought suit for specific performance on their sales contract and recorded a lis pendens against the ranch.

In March 1988, FmHA sent a debt-settlement application to defendants' attorney and made clear that the Riches would still be responsible for any deficiency even if they sold the ranch and the equipment. FmHA also met with the Riches to discuss debt settlement procedures on April 22, 1988. The Riches continued to seek a release of personal liability from FmHA, and on April 29, 1988, the Riches informed FmHA by letter that they consented to the sale to the Cramers on condition that they be relieved of all further liability to FmHA. FmHA rejected this condition on May 25, 1988.

On December 22, 1989, the Riches contacted FmHA about voluntary liquidation of the equipment. Defendants then returned the Agreement for Voluntary Liquidation of Chattel Security and an Application for Debt Settlement. The Riches executed the Offer to Convey Security on January 10, 1990, in which they offered to convey all of FmHA's security in full satisfaction of their debt. On January 31, 1990, the FmHA County Committee refused to recommend that defendants be fully released from all liability to FmHA upon voluntary liquidation.[2] FmHA discussed this decision with defendants on February 2, 1990. Also on that day, FmHA sent defendants a letter advising them of the decision and of their appeal rights. FmHA

then returned defendants' Offer to Convey Security along with a letter stating that FmHA still planned to pick up and sell the equipment unless defendants objected. The Riches did not respond, and FmHA hired Northwest Auctioneers to pick up and sell the equipment. The sale was held on March 28, 1990, and the net sale amount of $18,-305.22 was applied against the promissory note balance. On October 5, 1990, FmHA sent the Riches another debt settlement application, and again they did not respond. On December 3, 1990, FmHA once more discussed debt settlement with defendants and re-sent the forms, but defendants did not respond. On February 4, 1991, FmHA sent one last letter concerning debt settlement, but the Riches still did not apply. Suit was filed on June 15, 1992.

Plaintiff United States seeks summary judgment and an award of $39,620.06 plus $7.2226 for each day after January 1, 1994. Defendants make a cross motion for summary judgment.

## II

The parties agree that the government's enforcement of a contract for money damages is governed by a six-year statute of limitations under 28 U.S.C. § 2415(a).[3] *See United States v. Dos Cabezas Corp.*, 995 F.2d 1486 (9th Cir.1993). FmHA accelerated defendants' note on August 4, 1986, and filed suit less than six years later on June 15, 1992; therefore, all payments due as of the acceleration date are not time-barred.[4] This much is undisputed.

The parties do dispute, however, whether defendants are liable for any other payments because of tolling of the statute of limita-

---

1. The record does not disclose FmHA's reasons for changing its position on releasing the Riches from their debts.

2. Due to a typographical error, the written report of the County Committee is ambiguous as to its recommendation. On the Certification or Recommendation form, the "ineligible" box is checked, but the typewritten text recommends release from personal liability. However, the record of the meeting lists the action taken as "not recommended" and the government has provided declarations from the three members of the County Committee professing that it was the unanimous finding of the Committee that defen-

dants could pay the balance of their loans and that they should not be released from personal liability. (*See* P.'s Reply Summ.J.Exs. A–D.)

3. The statute provides in relevant part that "every action for money damages brought by the United States or an officer or agency thereof which is founded upon any contract ... shall be barred unless the complaint is filed within six years after the right of action accrues ..."

4. Upon acceleration, the 1987 and 1988 payments became due immediately.

tions. In computing the limitations period, the court must exclude "all periods during which the defendant is exempt from legal process ... for any reason." 28 U.S.C. § 2416(b). In applying § 2416(b) to this case, the court must interpret it in the light "most favorable to the government [because] '[s]tatutes of limitation sought to be applied to bar rights of the Government, must receive a strict construction in favor of the Government.'" *FDIC v. Former Officers & Directors of Metro. Bank,* 884 F.2d 1304, 1309 (9th Cir.1989) (quoting *Badaracco v. Commissioner,* 464 U.S. 386, 391, 104 S.Ct. 756, 760, 78 L.Ed.2d 549 (1984)).

The government argues that a series of injunctions against FmHA, issued in other jurisdictions, effectively rendered farm debtors, like defendants, exempt from legal process on their debts for a period of 38½ months. Defendants argue that they were exempt from legal process, if at all, no longer than 30 months.

### A. *The* Coleman *Injunctions*

On November 14, 1983, the district court in the District of North Dakota issued a preliminary injunction in a national class action suit brought against FmHA.[5] As to all debtors who had obtained a farmer program loan, the injunction barred FmHA from accelerating their indebtedness, foreclosing on their real property or chattels, demanding voluntary conveyance, or repossessing chattels, unless FmHA gave 30 days informed notice in compliance with 7 U.S.C. § 1981a. *Coleman I,* 580 F.Supp. at 211. All FmHA State Directors were instructed by the FmHA Administrator to immediately cease loan accelerations and foreclosures until new regulations in compliance with the injunction could be adopted.[6] (Smalley[7] Decl. at ¶ 3.)

5. The *Coleman* class was defined as:
   all persons who have obtained a farmer program loan from the Farmers Home Administration, ... and whose loans are or will be administered in the Farmers Home Administration offices located throughout the United States ...
   *Coleman v. Block,* 580 F.Supp. 192, 192 (D.N.D. 1983) ("*Coleman I*").

6. Under the existing regulations, the FmHA county supervisor could determine that a bor-

On December 20, 1983, FmHA noticed the adoption of new pretermination procedures which FmHA believed complied with the requirements of the injunction and 7 U.S.C. § 1981a. *See* 49 Fed.Reg. 470 (January 4, 1984). With the adoption of these new procedures the first tolling period ended, (*see* Appendix, period (A),) and the first "window period" began.

The first window period ended on October 19, 1984, when the Tenth and Eleventh Circuits enjoined FmHA from proceeding under the new procedures because they were not implemented according to the notice-and-comment rule-making procedures required by the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 500 *et seq. Matzke v. Block,* 732 F.2d 799 (10th Cir.1984); *Curry v. Block,* 738 F.2d 1556 (11th Cir.1984). While these injunctions were not nationwide in scope, their rule-making requirements affected the regulations under which all FmHA offices were proceeding.

FmHA promulgated and published the proposed rules as required by the APA on November 30, 1984. After the appropriate period for comment, the final regulations were published on November 1, 1985, 50 Fed.Reg. 45740, and the second window period began. (*See* Appendix, period (B).) The regulations then were amended on January 1, 1986, to establish a priority system for sending acceleration notices, and FmHA began sending notices of acceleration and foreclosure on February 21, 1986.

This second window period ended May 7, 1987, when the *Coleman II* injunction was issued. *Coleman v. Block,* 663 F.Supp. 1315 (D.N.D.1987). This decision caused the FmHA Administrator to again suspend accelerations and foreclosure sales. (Smalley Decl. at ¶ 7.) In *Coleman II,* the district

rower was in "default" as defined in 7 C.F.R. § 1962.4(g) (1983), and decide to liquidate the loan under 7 C.F.R. § 1962.40 (1983) (chattel loans) and 7 C.F.R. § 1872.17 (1983) (real estate loans). This review was undertaken without notification to the farmer until after the decision was made. *See Coleman I,* 580 F.Supp. at 200–01.

7. Keith Smalley, Deputy Assistant Administrator, Farmer Programs, FmHA, Washington, D.C.

court for the District of North Dakota again issued a nationwide injunction, effective as of May 7, 1987, which required FmHA to halt all accelerations and foreclosures and to submit corrected pre-termination servicing forms to the district court for approval.[8] *Coleman II*, 663 F.Supp. at 1333, 1342. Also, on January 6, 1988, the Agricultural Credit Act was amended to require FmHA to give delinquent borrowers notice of available loan servicing programs. 7 U.S.C. § 1981d. Under this amendment, FmHA was prohibited from accelerating or foreclosing on any loan until it adopted final regulations implementing the new law. FmHA properly promulgated the required regulations which went into effect October 14, 1988. 7 C.F.R. §§ 1951.901 *et seq.* Shortly thereafter, on December 28, 1988, the *Coleman II* injunction was vacated by the Eighth Circuit and the case was remanded to the district court with directions to dismiss the complaint as moot. *Coleman v. Lyng*, 864 F.2d 604 (8th Cir.1988). This ended the third tolling period. (*See* Appendix, period (C).) Although the injunction was vacated, FmHA decided not to resume acceleration and foreclosure actions until the *Coleman* complaint was dismissed. The complaint was dismissed on February 21, 1989, and FmHA resumed accelerations and foreclosures on February 24, 1989. (Smalley Decl. at ¶ 8.)

## B. *Tolling Analysis Under § 2416(b)*

The government contends that it was barred from acceleration and foreclosure under the *Coleman* rulings for three periods totalling about 38½[9] months: November 14, 1983 to December 20, 1983 (*Coleman I*); October 19, 1984 to February 21, 1986 (*Curry* and *Matzke*);[10] and May 7, 1987 to February 24, 1989 (*Coleman II*). While defendants seem to agree that some tolling is appropriate due to this series of injunctions, they dispute the 38½ month figure. There is precious little case law interpreting the "exempt from legal process ... for any reason" language of 28 U.S.C. § 2416(b).

■ Defendants agree that they were exempt from legal process during the 36 day *Coleman I* injunction period in 1983. (*See* Appendix, period (A).) After that, however, they contend that they were never again exempt from legal process because defendants "effectively opted out of the *Coleman* class" and "subjected themselves to legal process." This argument fails because defendants took no legal steps to "opt out" of the national class, and they never told the FmHA Administrator that they were willing to subject themselves to involuntary legal process and to waive any benefits or rights guaranteed to the *Coleman* class.

■ Defendants also raise the argument accepted by the district court in *United States v. Dos Cabezas Corp.*, 1991 WL 520419 (D.Ariz.1991), that the statute of limitations should not be tolled under § 2416(b) due to

---

**8.** The district court held that flaws in FmHA's notice of default and impending adverse action forms caused a "denial of due process in the form of an arbitrary deprivation of a protected property right." *Coleman II*, 663 F.Supp. at 1333. To remedy this problem, the district court ordered FmHA to revise Form FmHA 1924–26 to include:

> the statement, prominently displayed, that complete explanations of the various [loan servicing] options listed on the form, and the implications or effects of choosing or rejecting them, are available at the local county FmHA office. FmHA must formulate and distribute to all of its county offices uniform and comprehensive, but also clear and readable, explanations of each of the options listed on FmHA 1924–26, including, but not necessarily limited to, the eligibility requirements, terms, restrictions, and benefits of each option, and the effect that choosing one option would have in

foreclosing the availability of other options.... [Also,] Defendants must redraft FmHA 1924–26 to allow borrowers to make a separate election of options for each loan accelerated and for each reason given for each proposed action.

*Id.* at 1332–1333.

**9.** In their briefs, the parties have calculated the tolling period in terms of months. For purposes of accuracy, the court has calculated the period of tolling in days.

**10.** In its Supplemental Brief, the government attempts to tack another 30 days on to this tolling period to account for the 30 days notice required by 7 C.F.R. §§ 1951.558, 1962.40. This argument is both belated and unpersuasive as the 30 days notice is part of the legal process, not an exemption from it for purposes of 28 U.S.C. § 2416(b).

*Curry* and *Matzke* because those "cases were not binding on foreclosures in the Ninth Circuit." *Dos Cabezas*, 1991 WL 520419 at *1.[11] This is an unduly narrow interpretation of § 2416(b) as it applies to the circumstances here. First, although the decisions and injunctions were not specifically framed as national in scope, they held that FmHA's newly adopted regulations had not been promulgated according to the APA, and they required FmHA to re-promulgate its acceleration and foreclosure rules in accordance with the APA's requirements. Therefore, the injunctions affected FmHA regulations that applied nationwide and required FmHA to issue new regulations that would also apply nationwide. Second, the FmHA Administrator acted responsibly in determining that the same regulations which violated the APA in the Tenth and Eleventh Circuits would also violate the APA in all of the other circuits and thus that persons situated like the Riches were exempt from legal process. To hold otherwise would require litigation of the same issue in every circuit, and would force the government to adopt a rigid posture of nonacquiescence in the face of persuasive authority from other circuits merely to prevent the statute of limitations from running. Such a rule would be wholly impractical and would ignore the nationwide responsibilities of an agency such as FmHA. Given that § 2416(b) should be interpreted in the light most favorable to the government, in these circumstances the Riches were exempt from process "for any reason" during the pendency of *Curry* and *Matzke*. Therefore, the first window period extended from December 20, 1983, to October 19, 1984, when the *Curry* and *Matzke* injunctions were issued.

◼ The parties also dispute when the second tolling period ended. The government contends that it should not end until FmHA began initiating accelerations and foreclosures on February 21, 1986. Defendants argue that they ceased to be exempt from process when the final regulations were published on November 1, 1985, and that FmHA's delay in initiating accelerations and foreclosures was of its own making and should not lengthen the tolling period. Although this 3½ month difference will not affect the number of payments on which the government may collect, for purposes of determining the total tolling period, the court finds that the second period ended November 1, 1985. (*See* Appendix, period (B).) The 3½ months during which FmHA established the priority of accelerations and implemented that system may well have been "a reasonable response time for a federal agency to implement a new nationwide program," (P.'s Suppl.Br. at 4,) but defendants were not exempt from legal process during this period.[12] FmHA legally could have proceeded against the Riches or any other borrower during this period, but it chose not to. Therefore, the second tolling period lasted from October 19, 1984 to November 1, 1985, totalling 378 days. (*See* Appendix, period (B).)

Accordingly, the second window period began November 1, 1985, and continued until May 7, 1987, when the *Coleman II* injunction became effective.[13] Defendants assert that this injunction did not apply to them because *Coleman II* did not bar the processing of those accounts that already properly had been accelerated. This argument is circular, however, because the court in *Coleman II* enjoined FmHA precisely because it found FmHA's current acceleration and foreclosure procedures improper. Therefore, FmHA

---

11. This decision was affirmed on other grounds by the Ninth Circuit. *United States v. Dos Cabezas Corp.*, 995 F.2d 1486 (9th Cir.1993). The Court of Appeals did not, however, discuss the district court's analysis of the *Coleman, Curry,* and *Matzke* injunctions, but merely mentioned, in passing, that the "injunctions remained in effect for a total of 21.5 months." *Id.* at 1488.

12. The government relies, in part, on FmHA's promulgation of an internal regulation establishing the priority of acceleration to toll the statute for an additional 1½ months. But this regulation was not required by any ruling of court and amounts to no more than certain processing procedures for defaulted loans. Indeed, the FmHA Administrator determined that the new regulation was exempt from the APA's notice-and-comment promulgation requirements because "it involves only internal agency management." 51 Fed.Reg. 3325, 3326 (1986).

13. Although the *Coleman II* injunction was not issued until June 2, 1987, it was made retroactive to May 7, 1987.

correctly halted the Riches' acceleration proceedings.

■ The parties again dispute the length of the tolling period under this injunction. The Riches argue that the tolling period should end upon publication of the final regulations on October 24, 1988. In this instance, however, FmHA was delayed from implementing those new regulations not by internal decision-making, but by a court-imposed nationwide injunction. Thus, defendants were exempt from legal process until the *Coleman II* injunction was vacated on December 28, 1988, *Coleman v. Lyng*, 864 F.2d 604 (8th Cir.1988), for a total of 601 days.[14] (*See* Appendix, period (C).)

■ The government asserts that the tolling period should be extended for another two months, until the *Coleman* complaint was dismissed, because "FmHA instructed its offices not to accelerate and liquidate until the District Court complied with the Eighth Circuit and dismissed the complaint." (P.'s Suppl.Br. at 5.) This was again an internal decision by FmHA, certainly reasonable, but it did not affect the Riches' exposure to legal process during this period, whether or not FmHA chose to proceed against them. Therefore, the tolling period ended when the *Coleman II* injunction was vacated on December 28, 1988.

For the above reasons, the court finds that the statute of limitations was tolled for a period of 1015 days.[15] When added to the six years allowed by the statute, the government may collect on all payments due within 8 years and 285 days of the date of filing. Thus, all payments due after September 4, 1983, are within the statute of limitations.

## III

■ Defendants argue that, regardless of the statute of limitations, FmHA waited an unreasonably long time after the first default before accelerating the promissory note in August 1986 and therefore should be barred from collecting.

Defendants' promissory note contained an optional acceleration clause. In such cases, a mere default on an installment does not begin the running of the statute of limitations on the full loan amount. Instead, the entire debt becomes due when the creditor affirmatively accelerates the note. *See, e.g., Curry v. United States Small Business Admin.*, 679 F.Supp. 966, 970 (N.D.Cal.1987). Although "a party is not at liberty to stave off operation of the statute [of limitations] inordinately by failing to make a demand [of acceleration]," *id.* (citations omitted), and the time for demand must be reasonable, *id.*, creditors are accorded a great deal of discretion in determining whether acceleration must occur immediately upon default. *United States v. Feterl*, 849 F.2d 354, 357 (8th Cir.1988) ("Because acceleration clauses are generally for the benefit of the creditor, courts tread lightly on the creditor's freedom to decide whether acceleration is immediately necessary upon the occurrence of a default" (citation omitted).). Additionally, both debtors and creditors benefit by negotiating a satisfactory resolution short of default and foreclosure, and the time taken to attempt to reach such resolutions normally should not be counted against the creditor. *See Curry*, 679 F.Supp. at 970 (The government acted "reasonably and charitably in allowing [debtor] over three years of delinquency on her payments during negotiations on a new repayment schedule.").

Starting shortly after defendants missed their second installment payment in January 1983, FmHA made several attempts to work with the Riches to solve their debt problems. These negotiations included several requests by FmHA for defendants' authorization to proceed with voluntary liquidation. FmHA repeatedly asked the Riches to propose a plan for debt settlement. In addition, during 13½ months of this period, FmHA was enjoined from accelerating the note. In these circumstances, it was not unreasonable for FmHA to wait until August 1986 to accelerate the note. Moreover, in light of the statute of limitations analysis above, plaintiffs must argue that the acceleration should have occurred by September 4, 1983. FmHA

---

**14.** The court notes that 1988 was a leap year.

**15.** *See* Appendix:

| (A) | + | (B) | + | (C) | = 1015 days |
|---|---|---|---|---|---|
| 36 days | | 378 days | | 601 days | |

clearly was not unreasonable in deferring acceleration past this early date.

## IV

In their opposition to the government's motion, defendants assert that the government is estopped from enforcing the note because defendants were falsely informed that the FmHA County Committee had declined to recommend them for release from liability. In its reply brief, the government explains that while the recommendation form is somewhat ambiguous, the County Committee in fact did not recommend release from the debt and provides declarations from the committee members to that effect. (*See* P.'s Reply Summ.J.Exs. A–D, and n. 2, *supra.*) Because defendants were not misinformed, their estoppel argument fails.

## V

■ Defendants' final argument is that they should be released from liability because FmHA acted unreasonably and failed to mitigate its losses by accepting any of the purchase offers on the property and equipment. Even if FmHA's right to recovery depended on the reasonableness of its conduct—and defendants cite no cases or statutes in support of the argument—it was not unreasonable for FmHA to refuse sales of-fers that were contingent upon the full release of defendants from all personal liability [16] when the FmHA County Committee had determined that defendants were not eligible for release and that they had the reasonable ability to pay their debts. (*See* P.'s Reply Summ.J.Exs. A–D.) FmHA did finally approve the sale to the Buruds, but the sale fell through when the Cramers attempted to specifically enforce their sales contract.

Defendants also complain about FmHA's protection of its collateral. But the record demonstrates that FmHA acted reasonably in this respect. Indeed, FmHA made an additional loan to reimburse the Riches' tenant for equipment repairs.

Defendants fail to raise a material issue of fact as to the reasonableness of FmHA's conduct and provide no legal authority for their argument that FmHA's supposed unreasonableness is an affirmative defense to the collection of a debt.

## VI

For the reasons stated above, the government is entitled to judgment as a matter of law on all payments due after September 4, 1983.

IT IS SO ORDERED.

---

**16.** Defendants assert that they "lined up numerous prospective buyers who were willing to buy the ranch and *assume the total debt*." (D.'s Reply Summ.J. at 10 (emphasis in original).) This is simply not true. All of the sales contracts were for a specified amount less than the amount of the promissory note principal, and all were contingent upon FmHA releasing defendants from any further liability.

## APPENDIX

2/27/81 — $25,000 loan to Riches

1/1/82 — 1st $5392 payment due (not paid)

1/14/82 — Riches pay $2500

1/1/83 — 2nd payment due (not paid)

11/14/83 — Coleman I injunction issued.

12/20/83 — Regulations amended.

1/1/84 — 3rd payment due (not paid)

(A) 36 days

10/19/84 — 1st window period ends (Curry & Matzke decisions).

11/30/84 — Proposed regulations published.

1/1/85 — 4th payment due (not paid).

11/1/85 — Final regulations published.

1/1/86 — Regulations amended. 5th payment due (not paid).

2/11/86 — FmHA sends Riches Notice of Intent to Take Adverse Action.

2/21/86 — FmHA begins initiating accelerations and foreclosures.

(B) 378 days

8/4/86 — FmHA accelerates the Riches' note.

1/1/87 — 6th payment due (not paid).

5/7/87 — Coleman II injunction issued (2nd window period ends).

1/1/88 — Regulations amended.

10/24/88 — Last payment due (not paid). Final regulations under A.C.A. published.

12/28/88 — Coleman II vacated.

(C) 601 days

2/21/89 — Coleman complaint dismissed. (FmHA resumes accelerations 2/24/89.)

1/1/90 — The Riches execute the Offer to Convey Security.

1/31/90 — FmHA County Committee rejects the Offer.

3/28/90 — Equipment sold at auction.

6/15/92 — Suit filed.